We'll hear argument now in Appeal 1360, In Re Mi Pueblo. Ms. Church, before you sit down, why don't you just come right to the podium and welcome to the court. Good morning to you. Please proceed and remember that we've read the briefs carefully and we've looked at the registration and the application. We basically know the facts. So you might want to start by addressing how you establish that the evidence in support of the Trademark Trial and Appeal Board's findings has to be viewed as less than substantial, as evidence that falls short of being substantial. I think, Your Honor, that the way that I would approach this... Yes, Your Honor. I would approach this by saying that when I looked at their evidence, so much of it was just conclusory. It was just, we believe that it's this way because we think this. That's the way it's got to be. And yet I looked at the case law, and the case law is all over the map. I mean, it's all very fact-specific. If I started looking at TTAB decisions, I found that they go in all kinds of different directions. Well, forget about other cases. On this case, what part of the evidence falls short of being substantial? Well, when you take a look at the marks, sir, as I showed them in our brief, there's a huge difference in the appearance of the marks. Not according to the finding of the Trademark Board. Yes, I know, sir. Maybe I could do this with an example, I think, that would be kind of interesting, perhaps, to the Court. And that is this. I think that there's a shifting standard as to what creates a commercial recollection or a commercial impression. I think it's changed a lot. If you went back in the 1980s, the word might be the main emphasis of what's in the mark. But today, we've got all these sound bites and fleeting images. We've got all kinds of foreign languages involved. So now you get down to, well, just how important are the words? And if you take a look at our mark, what we're emphasizing is not the words, but it's the overall design and the color. We never applied for a word mark. We never even tried to get a word mark, because that's not what we think is important. We think that what's important is the commercial recollection that people have. And if they associate that with a certain kind of quality of goods and performance of services, then you get a commercial impression in the mind of the people in the marketplace. Yeah, but the problem is, you're giving us your personal opinion of what consumers would think, looking at the two marks. But the Trademark Trial and Appeal Board has made findings of fact, which we have to review under a standard of substantial deference. Even if, had we been the board members, we might have ruled the other way. We might have said, the picture is more important than the words. But we weren't the fact finders. They were the fact finders. So I think under our case law, in order to prevail, you have to be able to persuade the panel that the evidentiary basis underlying the key findings of the board was so deficient that it amounts to less than substantial evidence. I think, sir, that the problem is with the system itself and the way the system is designed. When I came in to begin making my arguments, I wanted to use the Sleepcraft case as the standard because I thought that it was more applicable to an NRA case than the DuPont factors were. But there was a heavy emphasis in the trademark office, oh, you must use the DuPont factors. These are the factors that were the Fed Circuit's case back to its predecessor, and these are the factors you must use. I looked at the factors. I said, well, there's not a lot of difference in these factors. Well, I guess that's all right with me. I don't have a big problem with that. Until I got into it more and discovered that they've gone from a 13-factor test down to a two-factor test, and they're trying to get to a one-factor test where if they just go in and do a word search, you're finished. Well, be that as it may, as a matter of history or as a matter of the conduct of the board in a whole range of cases, we just have this case in front of us. And if their findings of high similarity and high relatedness of the goods, the grocery store versus the salsa producer, if those findings stand, then it seems to me that the denial of the registration has to be affirmed. So that's why I'm trying to get at, well, what are the infirmities that one might see in those findings? Because if the findings stand, I think the case is over. The infirmities don't appear to me to be in the finding if the finding was based on the proper standard of review. I don't think that they made a proper standard of review in deciding whether they should affirm the examiner's opinion. That's the big issue here. And that's why... I don't really think that the examiner's opinion is of any significance in this case because when you read the board's opinion, the board refinds all the facts. They use the phrase, we find X, we find Y, we find Z. So unless holes can be shot in those findings, I don't see how we can reverse. Even if we would have found to the contrary had we been the board members. But if they make their findings based on presumptions of what it's necessary to find and they don't look at the hole mark, they don't consider all of the elements... Well, wait a minute. I think they did look at the hole mark because they specifically said, yes, there's some pictures there and there's some words but the commercial impression is that the words are the dominant part of the mark and the picture isn't very distinctive and it's not all that different than the picture of the previously registered mark. Therefore, we conclude likelihood of confusion of consumers is present. Now, you basically say, well, they got it wrong. The picture is more important than the words and maybe you're right. I don't know, but I'm, I think, stuck with their finding that the words in this particular pair of marks dominate compared to the picture. If the system is corrupted from the beginning, sir, if the basis on which they're making a finding is that all that matters is the word, they didn't say that. They didn't say that ignore everything but the words. They said that the words predominate compared to the picture of the house. The arguments that they made, sir, said that the words were the important part and it even said that. It's an, you must arrive at this conclusion. You must get to the place where you say the words are the only part of the mark that is really important. That that's what everything is going to devolve down to. And it's in their brief, sir. I could get. Well, forget about their brief. You know, that's attorney argument. What I'm trying to get you to focus on is the findings explicitly made by the board. Well, that's why I'm at this court, sir. If I thought that they had used the proper standard of analysis to arrive at their decision, I wouldn't be here. The reason I'm here is I think there's a problem with the system. I think it's hurting the entire commercial industry. Well, what would you suggest is the proper standard? I mean, how would you articulate if, let's forget, you think they did it wrong. What would you, can you articulate a finite test that you would apply that you think? Well, there were 13 factors in the DuPont case that they said that we should be looking at. They said we should be looking at. Okay, I'm not, no, I know what they said. I'm asking you since you suggested that there's some legal error here in terms of the law or the rules that they applied. I want to know, I would like to know from you if you could articulate what the right standard would be. I think we're on a slippery slope here. I think what happens is this. If you make the conclusion that because someone has a word mark, because they have a typed mark, that means they can go on forever and come up with whatever mark they would like to and no one else can ever use that word because they have a word mark. Once you make that assumption coming out of the starting gate, then there's a problem. I think that if you do that, then whether marks are substantially similar gets down to just a word search. I do a word search. If the words are the same, then the marks are substantially similar. Let me ask you a hypothetical question. Suppose that your application mark, instead of having the little Pueblo gate and house in the background of the words, had a huge image of the Empire State Building and the same words, mi Pueblo. That might be a very different case. That might be prominent enough and distinctive enough to be the dominant feature as compared to the words and to avoid a likelihood of confusion. I think that that's true, but actually the words are not separate from our mark. They're a part of the mark. They're a part of the shape of the mark. They're a part of the design and the color scheme is there for a reason. But the registration upon which the patent office, the TTAB, based its rejection is one that doesn't claim all of those specifics, but rather is just a word mark. No. So is it inappropriate for them to say it covers any, whether the word was written in yellow, red, blue, or green? The question is here whether the mark can be distinguished by the consumer, whether the commercial impression and recollection of the consumer will be different. Correct, but is it the commercial mark they actually use or is it the thing that was registered? Well, that's a good question because my client tried to find examples of their mark. I mean, they are, they do name brand products and as you can see from our brief, the only evidence we have of what their mark looks like is a label that went on a salsa jar. Well, my client's in the grocery store business, so they go out there and they try and find examples of how this mark's been used on their products. They can't even find the product on sale. Now, that's a collateral issue, but it gets to the difficulty of trying to say what does their mark look like, okay? Their mark, the only example is the one that you see. So if we're talking about commercial impression, how can you have a commercial impression from somebody having filed an application for a typed mark? Now, if that typed mark is what they're using out in the marketplace, fine, then that's it. It's the typed mark. Well, we certainly don't look like the typed mark. If your view, counsel, is that the ordinary consumers would readily distinguish your application mark from the previously granted registration for the other company's mark, couldn't you have brought in some survey evidence in which you randomly select 12 ordinary shoppers and you show them the two marks and have some sort of test whether they can readily distinguish the one from the other? That kind of evidence would have been appropriate. It might have been probative, but as I understand the record here, there is no such evidence on your side. Is that right? We did not do a survey, sir. Nor is there any affidavit evidence or other evidence from any consumer, even a single consumer saying, I can tell the difference, right? Well, if their product's not on the market, sir, it's hard to get that kind of an affidavit. We went out and looked for it. We tried to find it. We tried to find it on sale. You found the label. You could have shown a consumer the label and then shown them your application mark and tested whether they could readily see a difference. Sir, can you see a difference? I mean, if something is so obvious in looking at it, if you can look at it, right, and see that it doesn't look at all the same. Yeah, but our case law says you don't look at them side by side because the question is whether the consumer, having seen one in January when he goes to the store in February with the memory of the first label and looks at the second label and says, oh, that's a different company because this label is very different from the one I remember seeing a month ago. Sir, we're not talking about goods and goods here. We're talking about services versus goods, and I think that's a really important distinction. We're not talking about jars of salsa sitting on a shelf next to each other where you're looking at the labels. We're talking about grocery store services. This Mi Pueblo company has now got 14 major stores. They just opened one in East Palo Alto between Ikea and Home Depot, 40,000 square foot store. These stores have tens of thousands of items in them. They are not, we're talking about services here where we're making available to the public all kinds of things, none of which are manufactured, none of which is the quality controlled by Mi Pueblo, Inc. Okay? So when you ask me, well, why don't I have somebody comparing labels? Our mark is used on huge buildings, on sides of trucks, on distribution warehouses. It's in television. It's in the newspapers. The store provides vans to pick up customers that can't get to the store to bring them to the store. What we're offering is a service. Lots of stores have a store brand, and therefore the trademark is not only on the sign in front of the store, but it's on the label of products on the shelves in that same store. And when they do that, you will know that because they want to make clear that it's their store brand. And you're not going to go into another store. But I mean, I'm responding to your point that, hey, this was a service mark for the service of providing a grocery store, and I'm saying, well, yeah, it is a service mark, but grocery stores often sell products that that same company that runs the store itself makes that we often refer to as house brands. And if they do, they're going to say right on them that they're the house brand, sir. And so it's a very, very remote possibility that a service provider who sells whatever his customer wants, who walks in the door for retail grocery store services, that he's going to put his mark on something that he's not the source of. He wouldn't do that. He could ruin his reputation. Not only that, but you're not going to find his product in somebody else's grocery store because they aren't going to stock something with their competitor's mark on it. They don't want that kind of publicity. What we're trying to say here, sir, is the odds of a commercial, the odds of an actual impression in the mind of the consumer that would cause confusion is just de minimis here. It's just not going to happen. Now, so, but I know it's not the actuality that matters. It's whether it's likely that it's going to happen. And what we're saying is, first of all, they start out by saying, if it's the word, then the marks are similar. And then they say, based on the Shell Oil case, which came out of this court, well, and if the marks are similar, then we don't really have to look at the channels of trade very closely or anything because people are obviously going to get confused. And we're saying, wait a minute here, you know. You're reaching a lot of conclusions without looking at the evidence. We submitted evidence. We showed that these people made name brands for stores on request, made special brand products. They sell directly to the huge grocery store chains. They sell to redistributors. When they do that, those people know exactly who they're buying from, to the penny, to the exact quality, to the exact item. There's not going to be any confusion by the people that are buying their product. But that evidence was totally ignored by the people at the trademark office. They said, we don't have to look at that. Well, what do you mean it was totally ignored? I don't understand. We submitted it. I never got a comment on it. Never once. Well, we, you know, decision makers don't comment on every piece of evidence provided in any kind of proceeding. Otherwise, every opinion would have to be hundreds of pages long. But sir, if you look at their brief and you look at all the conclusions they jump to and how they get from one place to another. Well, I don't care about their brief. What I'm particularly focused on is the 14-page opinion of the trademark board, which is replete with specific findings. Now, you may disagree with the findings. I might even disagree with the findings. But what we're reviewing here is the findings of the trademark board as embodied in this 13, 14-page opinion. And so for you to say, well, the solicitor's office brief says this and this and this, who cares? What counts is the findings made by the board in this opinion. Sir, when I was trying to submit my brief for the TTAB, I was getting ready to send in the three copies and I contacted them. They said, oh, you don't need to send in three copies. Just send in one copy because we're going to scan it through our system and it gets distributed. We don't need three copies. I said, well, okay, have you got a colored scanner? Well, no, it's black and white. I said, but I have a color claim and the color is very important to my mark. It gives you the commercial impression of the mark. How can the judges make a decision whether it's correct or not when they're going to get the black and white copy off a scanner? So I think what I'm saying here, sir, is that the evidence was not properly reviewed. There was not substantial evidence to support the decision that they made and that if this continues, not only is my client going to be harmed, but so is every other similarly situated person that comes up before the trademark office. We need to get an answer. I think you've made your position very clear and we've given you some extra time. Let's hear from the solicitor now and then we'll give you some rebuttal time back. Thank you, sir. Thank you. Thank you. Mr. Shaw. Good morning. Welcome to the court. You heard the argument. We don't need to rehash everything in the briefs. What's your response to the principal arguments made here today by Ms. Church? Yes, Your Honor. May it please the court. It's the office's view that this is a fairly straightforward 2D refusal. Using longstanding precedent of this court, the Trademark Title Appeal Board found the marks were highly similar. I don't think one could dispute that when you have a type mark and a special form mark that as we have here, that those marks are not highly similar. I understood Ms. Church to be disputing exactly that. She's saying they're not similar at all. You're right, Your Honor. It doesn't help us for you to say, oh, yes, they are. It's like two little kids arguing. Yes, it is. No, it isn't. Yes, it is. No, it isn't. Yes, Your Honor. And I'm sorry, I apologize if I gave that impression. The office is bound to follow the precedent of this court, Your Honor. We are bound by it. And I think the TTAB, when they went through the decision, they were very careful to look at the mark as a whole. I think the office has been reversed enough on that issue to be very sensitive to it. They looked at the mark as a whole. They found that the word Mi Pueblo was dominant because it's the way that the mark is called for in the marketplace. And there's precedent from this court that says that the spoken portion can be dominant. So is it possible for a design, when you have a word mark like this typeface that was granted registration, and then you have a later applicant who comes along using the same words but has a design, is it possible that the design could dominate and that, therefore, the design could result in them not being deemed similar? Yes, Your Honor. I think if there's something about the nature of the design, and for example, if the wording is quite small. Like Judge Michel's Empire State Building, for example. It's possible. Although I would suggest that since this is a type mark, the registration that is, that that would not necessarily overcome because the type mark really can be used in any form. I think that would create an unusual juxtaposition of the context of a little village in New York City. Well, wait a minute. I mean, I understand there's a fact finding here that the words Mi Pueblo are dominant. And maybe in this context, I have to say there's substantial evidence for that, perhaps. But what I'm trying to get at with you is, are there circumstances in which the words would not be dominant? Because what I, for one, would be concerned about would be saying that the word mark, Mi Pueblo, type-faced, therefore precludes any future use of it, no matter how it's used, no matter how big the picture is or desire is. Absolutely, Your Honor. We're certainly not saying that there's a per se rule that the words are always dominant. Yeah, but you started saying, but the words have to be really small, and the Empire State Building might not be enough. And you were going awfully close to that rule, and that was what was concerning me. And I would apologize. Mr. Shaw, you should observe the convention that you don't begin your answer until the judge has finished her question. Yes, Your Honor. Yes, Your Honor. So you were sort of going down that road, and I wanted to know from you exactly what the circumstances would be when a mark that is being applied for uses the same words but could still be allowed. There is no question that a design can also be dominant. If you have a combined mark where there's a word and a design, there's no question that Your Honor is right. If the design, the design can be dominant. And there are any number of examples of how that might come into play, and that's what I was trying to explain by saying, well, for example, the words might be less dominant because they're small, or they might be less dominant because they're weak, or they might be less dominant simply because the design itself is so unique or so unusual. So we are certainly not advocating that there's any kind of a per se rule that words are always dominant. In this case, when the board went through the analysis looking at the applicant's mark, they found that each of the other elements in the mark tended to reinforce the meaning of Mi Pueblo. That is, that the village design suggested the meaning of Mi Pueblo, which is my town or my village,  and was an abbreviation for Mi Pueblo. So in this case, the board found that that's why Mi Pueblo was dominant. Not because there's a per se rule for dominance of words, but because when looking at it as a whole, that's what the board essentially found. And when an applicant has, or when a registrant has Mi Pueblo, and it's just type-faced, is it then totally irrelevant to any determination in the board unlikelihood of confusion when a new applicant files what the actual commercial use by the registrant is. Meaning, do the type-faced words Mi Pueblo, are they presumed automatically per se to cover any possible design use of those words, no matter, even if the registrant uses them and they're red, white, and blue with a giant American flag behind it and these would be to any normal person clearly different because they're jagged edged or some sort of... You see what I'm getting at. Does the overlap in the words, because one is a type-faced registration, just doom all applications? Yes, Your Honor, essentially it does. Section 7 of the Trademark Act gives a presumption of validity that the registrant is the owner of the mark and they're entitled to use the mark on the particular goods identified in the application. And if you look at Rule 2.52, which covers drawings, it basically says that an applicant can come in for a type drawing without regard to font or style or color. And that gives them the right to change their mark from time to time and to use it in any manner that they want. And that essentially, the policy behind that, Your Honor, is that that registration for that mark is broad. They have a broad registration for those goods. But isn't there some rule that if you don't use a registration in some period of time, that it's no longer good, for example? You have to be using it. So why wouldn't the rule somehow devolve into the manner in which they're using? Because I can't go into the patent office or the trademark office and reserve the words, whatever words I want, if I'm not using them. So why wouldn't a similar concept apply to how you look at the registered mark? How has it been used? Well, the answer is the abandonment sections about which have been raised in this case really address the use of a mark at all. And in this case, the appellant is arguing that because the applicant has not used it in more than this particular form, that they've abandoned all other forms of use. Well, and you're suggesting that the PTO has reserved for them all forms of use and that no one else can ever apply for anything different. I'm finding that a little troubling. Well, it's not the PTO that said it, it's actually the statute. Because the statute says that you have a prima facie presumption of validity that you have the right to use the mark. And the mark in this case is in type form without particular style or font or color. And so when the statute says the mark, you go and look at the registration certificate and it's without limitation as to style or font or color. And so we are bound by that to say, okay, well that can be in any form that the applicant chooses to use, even if it's very similar to what the other party is using. Let me ask you a different question which goes to page 9 of the Board's ruling. In the final paragraph the Board makes a finding that I think is very interesting. And the key wording second sentence of the final paragraph on page 9. The key wording is, quote, although there are differences in appearance it is the wording, obviously the two words, mi pueblo it is the wording that is more likely to be remembered by purchasers. So saith the Board. Now I don't know about you, but I forget words all the time, but I remember pictures much better. So am I a fluke? Or am I typical of average purchasers? Or to put it differently how does the Board know that in the case of this specific application with the words and the pueblo picture in the background and so on that the potential purchasers are, quote, more likely to remember the words but not the picture? What's the basis of that? Well, I think the basis in the precedent is No, no, no, not precedent. What is the basis in the evidence in this exact case? I think it's the perception that when the customer goes into the store or is in sort of the retail environment that they're more inclined to recall a product by name. How does the Board reach that conclusion? What evidence are they resting their conclusion on when they say the customers will remember the words but not the drawing? Well, the only evidence in the record regarding the marks is of course the marks themselves. There's no interpretive evidence. There's a translation of the term. I think it is the total impression that the mark has is that no matter what element you look at, it always comes back to the concept of Mi Pueblo, the word Mi Pueblo. You have a small village that is essentially translated to Mi Pueblo translates to my village or my town. So when you look at this mark, that is the applicant's mark, you always come back to the concept of Mi Pueblo, my village. We're kind of going in a circle. When you say we always come back you're just saying you agree with the Board members that the words count, the picture doesn't. But I'm asking you a different question. What is the basis on which the Board concluded that the customers wouldn't remember the picture they would only remember the two words Mi Pueblo? What's the basis of that? Given the way that it's explained here, Your Honor, I can't really say. They have to have a basis, right? They can't pull it out of their ear. No, certainly not, Your Honor. Then it has to be a basis in the record in this case, not in some other case. In this case. The only thing I can suggest is when they looked at the mark itself, they felt the Mi Pueblo. And if you look at it, it's quite large. It's in very bright red. And it's very sort of distinctive. It's the biggest, it's the brightest thing in the mark. And I think that when one looks at this mark, Mi Pueblo jumps out at you. You have a paler sort of soft sepia-toned wall. And I think the answer is it's in the mark itself. What bothers me is that might be the way it looks to you, that might be the way it looks to me, that might be the way it looks to the Board member, but we're all irrelevant. The only people who count are the average typical purchasers of these kind of goods. So how do we know that they would remember the words but not the picture? Well, the only thing I can tell you, Your Honor, is as the finder of fact, they looked at the marks and found on their own that it was a dime. But the logic of that is we could never reverse. Because they're always the finder of the fact. That can't be right. Well, I think combined with this Court's precedent, Your Honor, I think that the word portions are often called for in the marketplace. People go in and they say, you know, do you carry Meek-Webler's also? Sure, often, but sometimes not. We have to decide which category this case falls in. Is this a word-dominant situation or is this a picture-dominant situation? And we have to look at that from the standpoint of the consumers, not Board members, not trademark experts, not assistant solicitors at the PTO, and not judges of this Court either. We all are supposed to, under the law, put ourselves mentally in the shoes of the average buyer of this type of product. How do the Board members know anything about what salsa buyers think? Or what department store shoppers think when they see a mark? Well, if the other evidence that's in the record, Your Honor, if you look at the other kinds of evidence that's in the record, you have, for example, a number of advertisements that show that grocery stores routinely sell Housemark branded products for sausages and salsa and for other products. And I think that consumers have become conditioned when they go into grocery stores to see products on the shelves that are offered by or produced by the same grocery store that they're in. So there's a fair bit of evidence in the record that shows that consumers are conditioned to see products in particular these products in many grocery stores. Counsel, picking up a little bit on this point, Judge Michelle had earlier asked or Chief Judge Michelle had earlier asked the appellant about a survey. And I just want to make sure I understand what the government's position on this is. Since the registrant has a word mark, not limited to a color or a particular font or anything, how exactly would applicants conduct a survey that you all would deem acceptable, what is it that they are to show in comparison to the mark that they're applying for? What exactly would they then show to survey participants? So I'm trying to get at how would the average purchaser perceive these two marks and if they wanted to attempt to prove that they would not see them as likely to be confused by, what is it you'd like them to show? Well I think obviously on the one hand they have to show the registrant's mark as applied for. The applicant's mark as applied for. The applicant's mark as applied for, fine. The applicant's mark as applied for. I don't think anybody was worried about that. They would have to show it's an interesting question and I'm not sure of the answer but I think there are obviously two possibilities. One is you could show the registrant's mark as registered and that of course. Just the type-faced words mi pueblo, wouldn't that pretty much be something that every consumer would look at and say no likelihood of confusion, these tiny little type-faced words versus this big colorful pretty mark? That's one possibility as I said. I have to imagine your office would come in and say that's not a good survey. We probably would. So what you would say is a good survey then? Using section 7 and using the import of rule 2.52 which says that applicant is entitled to use the mark in any style or form or font, I think it would be fair to allow them to use the exact same font and style and type-face as the applicant and so you'd essentially have near two identical word portions. I don't think you should be able to introduce into the survey the registrant's other trade dress. I think that would be inappropriate because that's not within the four corners of the registration. So a proper survey under the PTO would be mi pueblo as they've applied for it, the identical words mi pueblo in the same font with the same colors just without the picture. That would be the only survey that would really be deemed acceptable. I think that would be consistent with rule 2.52 rules and section 7 of the Trade Work Act. This may be the kind of case where we shouldn't have judges decided we should ask the audience what they think the commercial impression is. How easy it is to tell the difference between the two different marks. Let's give Ms. Church some rebuttal. Thank you Mr. Shaw. You know the solicitors in the audience that may sway the vote a little. We might have to disqualify him as an interested party and only allow neutral audience members to opine. Well Ms. Church no need to repeat your earlier points which were emphatically stated but anything new you want to say in response to Mr. Shaw's argument? Mr. Shaw just said that this typed mark applies to the goods which are identified in the application. And I can tell you that there is not one good identified in applicants application because we're not applying for registration of a good. We're applying for registration of a service mark where we sell thousands of goods. There's no way we can begin to number all the goods we sell. And so there's no way for us to combat something where they say well we only look at what's on the application that you send us. That's all we consider when we're making a decision here. Which was what I was told by the TTAB. Let me ask you a specific question. It looked like the trademark board relied significantly on the hyper shops case and the solicitor relies somewhat in the brief on that. But in your reply brief you made little or no mention of the hyper shops case. Can you distinguish that case from your case? Yes I think I can. I think it's really important to think about what grocery store services means to you means to everybody in this room. You take a good size grocery store like Safeway for example. You know when you go in there you can probably find toothpaste. You might find a few cleaning articles for your house. You're going to find produce. You're going to find meats, fish. You're going to find hopefully a deli if it's a nice big store. There's an expectation in the mind of the consumer about what a grocery store service is. Now I can't put all of that into my application on the paper when I file for the service mark. There's no way to put that in. We do this. We don't do that. We do this. We don't do that. That tells you what our service is. I think there's an expectation that's out in the public for what they expect. You're really not dealing with the facts of the hyper shop case. I'm trying to get you to deal with your facts versus the facts in hyper shop. In that case it was a retail grocery store and the products were products, furniture not limited to retail grocery and general merchandise store. That's what they did. That's what the mark was about. The product was furniture that was sold in such stores. The board found and we affirmed that in that circumstance there was likelihood of confusion. How are your facts different from those facts from that hyper shop case? I think I tried to distinguish that in my brief. Distinguishing a large store which sells like a Costco or a hyper shop which sells everything from canoes and toboggans to electronics to and just happens to offer a certain amount of groceries, food products as a part of the total contents of the store. You said you distinguished that in your brief. I'm looking at both of your briefs. You never make any mention at all of the hyper shop case. I think that it was in my brief to the TTAB then. I thought you meant in your briefs here. Sir, I think that I had gotten to the place where I felt that wasn't material. There's such a difference. I did comment in my brief that I distinguished from a large store. You need to respond to what the other side argues. Their brief cites the hyper shop case five different times on cited page numbers and then your subsequent brief, the gray brief, the reply brief, never mentions it at all. Then it may be in my original brief, sir, but I didn't refer to hyper shop specifically. What I did was distinguish retail grocery store services from services of these big micro Walmarts, Costco's. Our grocery store services are not like that. You're not going to find furniture in there. You would find salsa in there. But you will find salsa in there. Isn't that the source of trouble? If a grocery store sells salsa and you have similar marks for a salsa product by one company in a grocery store chain owned by another company, isn't that exactly the kind of situation the trademark law tries to avoid? Absolutely. And that's what we were getting down to. That's what I tried to describe in my brief. We tried to enter a stipulation at the trademark office because we have never sold the salsa Well, nobody can find it, but if it were sold, if it's actually out there, it's never been sold in our store. And so, how can you be confused about a good that's not sold in the store? Because you can go into a different store and see Mi Pueblo salsa and think it comes from your grocery. Yes, but would you? If it's a housemark, are they going to put a competitor's salsa on their shelf? Yes, possibly if you don't have your own name brand salsa. Not every store has its own name brand products. That's what I'm saying. You can't presume that it's a name brand product because it's on their shelf. And if it were a name brand product, they wouldn't want it on their shelf because they don't want to advertise for the other store. So, you really have to look at what's going on out in the marketplace. What's likely to happen? We're not talking about is there certainly confusion here? We're talking about is there likely to be confusion, sir? And I just wanted to mention this thing about if it doesn't appear on the application papers, we don't have to consider it. And that is in their brief. It wasn't on your application papers. And what I'm saying is there's no practical way that we could have put it on the application papers. Alright, thank you both. We'll take the